# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| Mary M. Showman, | : | Case No. 3:08CV0030 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. Pending are issues arising from the Briefs of the parties and Plaintiff's Reply (Docket Nos. 22, 25 and 26). For the reasons set forth below, the Commissioner's decision is affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for Title II DIB and Title XVI SSI on March 11, 2003, alleging that she had been disabled since October 1, 2002, due to degenerative disc disease, depression, paranoia, insomnia,

anxiety, a rash and inability to concentrate and remember detail (Tr. 64-66, 102, 541-543). The applications were denied initially and upon reconsideration (Tr. 40-43, 67-69). Plaintiff requested an administrative hearing, and on March 15, 2006, Administrative Law Judge (ALJ) John Pope conducted a hearing at which Plaintiff, represented by counsel Loretta Willey, and Vocational Expert (VE) Joseph Havranek appeared and testified. The ALJ issued an unfavorable decision on February 27, 2007 (Tr. 15-23). The Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the Commissioner's final decision (Tr. 4-6).

## FACTUAL BACKGROUND

*The Plaintiff's Testimony*

Plaintiff was divorced, 48 years of age, weighed 150 pounds and was 5'2" tall (Tr. 552, 553). Plaintiff and her sixteen-year old daughter resided in an apartment (Tr. 553). She also had an adult son (Tr. 128, 580-581).

Plaintiff was awarded an associates degree in early childhood education in 1985. In the 1980s, she worked at a daycare center (Tr. 554). She was last employed in February 2003. Plaintiff stopped working because of panic attacks, paranoia and anxiety (Tr. 555, 556). During the fifteen years preceding the hearing, Plaintiff had been employed as a janitor, job coach, production worker and housekeeper (Tr. 557).

Plaintiff had a medical history of degenerative disc disease at L-3 and L-4, tennis elbow, right big toe displacement, cephalgia, hypertension, herniated disc and hypercholesterolemia (Tr. 558, 559, 560, 561, 562). She had persistent back pain that she compared to being struck with a sledge hammer (Tr. 558, 583-

584). Diagnosed with a bipolar disorder, Plaintiff experienced visual and auditory hallucinations, cold sweats and heart palpitations (Tr. 574, 575, 589). She estimated that she had a panic attack weekly (Tr. 576). When she experienced these attacks, she "broke out in a sweat and her heart slammed against her rib cage" followed by tremors (Tr. 589). She described the pain in her toes and feet as achy (Tr. 584). Plaintiff described herself as an agoraphobe(Tr. 576). When she did appear in public, she avoided contact with the general public (Tr. 582). Plaintiff had experienced suicidal ideations (Tr. 576).

The medication prescribed to treat Plaintiff's maladies included a cholesterol lowering agent, skin care medication, medication designed to treat stomach disorders, a narcotic pain reliever and medication to lower her blood pressure (Tr. 560, 565). The combination of medications facilitated sleep; however, Plaintiff was often drowsy (Tr. 565). Plaintiff was awaiting notification that she could resume therapy (Tr. 579).

Plaintiff's physical condition affected her capacity for walking. She could stand for ten to fifteen minutes. Her physician imposed a restriction of lifting no more than fifteen pounds; however, lifting was contraindicated (Tr. 560, 563, 584). She could sit for fifteen minutes (Tr. 587). However, she had to alternate between sitting and standing (Tr. 585). Because of Plaintiff's diminished ability to concentrate, she was required to re-read material several times to improve her comprehension (Tr. 583).

During a typical day, Plaintiff claimed that she arose after a night of disruptive sleep to determine if her daughter had breakfast (Tr. 566, 588). Plaintiff was able to bathe and dress herself (Tr. 568, 571). She sat and watched television for no more than fifteen minutes to prevent cramps in her back (Tr. 566). She continued to watch television while standing. After her daughter left, she ate breakfast and took her

medication. She called her caseworker and her brother to avoid the onset of a panic attack (Tr. 567). After an hour of conversation, Plaintiff soaked in a tub of hot water and managed her affairs (Tr. 568). Plaintiff retired around 1:30 P.M., sometimes taking a nap, allowing her body to rest and clearing her mind for approximately one half hour (Tr. 569). Plaintiff estimated that she spent a couple of hours daily lying down (Tr. 588). Plaintiff was unable to prepare a simple meal so her daughter prepared meals in the microwave. Plaintiff shopped with her daughter. Plaintiff vacuumed for short periods of time (Tr. 572). She did not wash dishes but could do the laundry. Plaintiff had no hobbies and she performed exercises prescribed by a rehabilitation counselor (Tr. 573).

*The VE's Testimony*

The VE confined his analysis to the region consisting of all counties within a 75-mile radius of Toledo, Ohio (Tr. 591). The hypothetical individual in the age range of 44 to 48, with an associates degree in early childhood development, past relevant work including jobs as a janitor, job coach, production worker and cleaning person, limited to medium work and further limited to simple repetitive tasks involving only occasional contact with the general public, co-workers and supervisors, could perform all of Plaintiff's past relevant work (Tr. 592-593). In addition, the hypothetical individual could perform work as a floor waxer at the medium exertional level, laundry folder at the light unskilled level and microphone document preparer at the sedentary unskilled level. There are approximately 500-750 floor waxer positions, 751,000 laundry folder jobs and 500 microphone document preparer jobs (Tr. 593). Overall, there would be at least 100,000 jobs at the medium level, 100,000 at the light unskilled level and 5,000 sedentary jobs.

Plaintiff would be confined to sedentary work if she needed to lie down for two hours daily and she

had difficulty with her feet which would preclude walking for long distances (Tr. 594). Persistent drowsiness, auditory and visual hallucinations and panic attacks would suggest non-employability on a sustained basis (Tr. 594-595). These jobs were consistent with the DICTIONARY OF OCCUPATIONAL TITLES and standard characteristics of the occupations (Tr. 595).

## MEDICAL EVIDENCE

1. **Americore Therapies & Consultancy**.

Plaintiff's physical functional and mental status were assessed and manual muscle tests were performed on August 8, 2003. Her ability to stand, walk and sit were within normal limits. However, her history of depression and anxiety/panic attacks would debilitate her ability to function (Tr. 183). Plaintiff's shoulders, elbows, forearms, wrists and fingers were within normal limits when manual muscle testing was administered. Plaintiff could raise her right hip and knee flexors, extensors and abductors against gravity with minimal/moderate resistance. She could only raise her left hip and knee flexors, extensors and abductors against gravity without any resistance (Tr. 180).

2. **Sanford A. Kimmel, Medical Doctor (M. D.).**

Dr. Kimmel treated Plaintiff from February 10, 1989 to June 30, 2002 and from December 12, 2002 to April 27, 2005. During the first course of treatment, Plaintiff was treated for the onset of menopausal symptoms, chronic back pain, chest pain, potential food poisoning, recurrent rash and left flank pain (Tr. 167-171). An electrocardiogram interpreted on March 3, 1994, showed normal rhythm (Tr. 355).

During the second course of treatment, Dr. Kimmel addressed problems such as hypertension, rhinitis, sciatica, chronic low back pain, elevated cholesterol levels, impingement syndrome of the left

5

shoulder, moderately severe degenerative disc disease and left elbow pain (Tr. 305-329). Dr. Kimmel prescribed medications to control o Plaintiff's hypertension and to a lessor extent, control her high cholesterol (Tr. 309). He treated Plaintiff after foot surgery by prescribing additional pain relievers and monitoring the postoperative placement of the prosthetic joint (Tr. 313, 315).

On April 23, 2003, Dr. Kimmel administered an X-ray of Plaintiff's right foot and referred her to a podiatrist (Tr. 336). In May 2003, Dr. Kimmel obtained confirmation that Plaintiff had "pure degenerative arthritis" not gouty arthritis (Tr. 349). On June 30, 2003, Dr. Kimmel found calcification along the medial epicondyle and mild degenerative joint disease (Tr. 347). On July 18, 2003, Dr. Kimmel found that Plaintiff had mild tenderness in the lumbosacral spine, no noted motor loss, normal gait and ability to do fine and gross manipulation (Tr. 165-166). Apparently the X-ray taken of Plaintiff's right elbow on September 29, 2003, revealed no abnormality (Tr. 336). On December 22, 2003, Dr. Kimmel administered an injection in Plaintiff's left shoulder to relieve pain (Tr. 322). The X-ray of Plaintiff's shoulder taken on December 30, 2003, showed left shoulder impingement with evidence of hypertrophic bony change involving the joint at the top of the shoulder (Tr. 345).

Blood chemistry samples collected on April 14 and September 17, 2004 showed elevated cholesterol levels (Tr. 340, 343). The lumbosacral spine magnetic resonance imaging (MRI) taken on January 19, 2005 showed no significant abnormality (Tr. 339). On July 12, 2005, a statin used to lower cholesterol was prescribed (Tr. 531). In October, Plaintiff was treated for low back pain with pain medication (Tr. 528). Plaintiff was diagnosed with chronic back pain and pre-diabetes on December 5, 2005. Dosages of medication prescribed to treat hypertension and hyperlipidemia were increased as the currant dosage had

been ineffective in controlling these conditions (Tr. 524).

**3.     Medical College of Ohio/Medical University of Ohio (MCO/MUO)**

In January 2004, Plaintiff was treated for left shoulder and elbow pain. Prescriptions for arthritis medication and physical therapy were issued (Tr. 398-399). Plaintiff was evaluated in the physical therapy department on June 1, 2004, and a plan to relieve left shoulder and low back pain was constructed (Tr. 394, 396).

Dr. Mary Smith conducted individual psychotherapy with Plaintiff at MCO beginning on September 6, 2002 (Tr. 519). In addition to assessing her affect and mental status, Dr. Smith consistently adjusted the dosages of medication prescribed to treat depression in an attempt to control the symptoms such as insomnia (Tr. 464-520). Dr. Kimmel was incorporated into Plaintiff's plan of care to maintain Plaintiff's physical health (Tr. 513, 514, 515, 516). On April 9, 2003, Dr. Smith noted that Xanax was helping to control anxiety (Tr. 508). However, in March 2006, Dr. Smith concluded that although the panic disorder was under control the symptoms were worsening (Tr. 520). She observed marked limitations in Plaintiff's ability to understand and remember detailed instructions, maintain attention for extended periods of time, perform activities with a regular schedule, maintain regular attendance and be punctual within customary tolerances (Tr. 521).

Plaintiff's cholesterol levels were elevated on July 20 and October 25, 2005 (Tr. 532, 534). In the meantime, Plaintiff underwent a joint replacement in her big toe. The examination of that toe on August 31, 2005, showed excellent alignment, no loosening or acute bony abnormality (Tr. 533). The summary of Plaintiff's problems completed on October 6, 2005, showed that Plaintiff had been diagnosed with

hypertension, hyperlipidemia, depression, allergic rhinitis and gastrointestinal reflux disease. At that time Plaintiff was only taking medication to control her blood pressure and cholesterol (Tr. 540).

**4.     Mental Residual Functional Capacity Assessment (MRFCA)**

On August 25, 2003, Dr. Benninger reiterated that Plaintiff suffered from major depression, recurrent, panic and mood disorders (Tr. 199). Dr. Benninger opined Plaintiff was moderately limited in her ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) complete a normal work day and work week without interruption from psychologically based symptoms, (4) interact appropriately with the general public, (5) accept instructions and respond appropriately to criticism and (6) be aware of normal hazards and take appropriate precautions (Tr. 197-198).

**5.     Sonja Stahl Pinsky, M.D.**

On June 23, 2003, Dr. Pinsky conducted a psychiatric evaluation during which she diagnosed Plaintiff with a mood disorder, major depressive disorder, recurrent, paranoid personality disorder, moderate to marked psychological stressors and some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and as having some meaningful interpersonal relationships (Tr. 176-177).

**6.     Psychiatric Review Technique Form (PRTF).**

**1.** On August 25, 2003, Dr. William E. Benninger, Ph. D, diagnosed Plaintiff with a medically determinable impairment precisely designated as a major depressive disorder, recurrent, mood disorder and a panic disorder (Tr. 187, 189). These impairments resulted in mild restrictions of activities of daily living and difficulties in maintaining concentration, persistence or pace and moderate difficulties in maintaining

8

social functioning (Tr. 194).

**2**. On May 5, 2004, Dr. Caroline Throckmorton Lewin, Ph. D., noted that Plaintiff was not cooperative, thus, she was unable to assess whether her condition had worsened since reconsideration of her claim (Tr. 248).

**7.    Zepf Community Mental Health Center**

Jeffrey D. Long, M.Ed., a diagnostician clinical supervisor, conducted an assessment on June 12, 1997, after which he diagnosed Plaintiff with major depression, panic disorder and moderate to severe symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 210).

On June 13, 1997, Dr. Mary Smith diagnosed Plaintiff with major depressive, panic and mood disorders, psychological stressors and serious symptoms or any serious impairment in social, occupational, or school functioning.  She continued Plaintiff on her dosages of medication designed to treat major depressive disorders (Tr. 207).

Throughout the course of treatment conducted by Zepf personnel, Plaintiff consulted with a vocational counsel, obtained refills on her prescriptions and underwent medication education.  Her mood was monitored as well as the side effects and benefits of her medication and treatment alternatives were considered (Tr. 213, 214, 238-239, 240-244, 278-303).  The most significant improvement in her care was the addition of additional medication prescribed for treating depression that also relieved insomnia (Tr. 283).

It was observed that Plaintiff's mood disorder was in partial remission and her panic disorder was in full remission on May 17, 2002 (Tr. 239).  An individual recovery plan, in conjunction with her drug therapy, was  designed to reduce depression (Tr. 211).  The terms of the plan included physical and mental

health maintenance plans and a money management review (Tr. 360, 362).

A community support program was also utilized to implement the recovery plan by identifying resources to address psychosocial stressors, reduce symptoms of anxiety and depression, eliminate barriers to implementing the plan and empowering Plaintiff to obtain the goals of the plan (Tr. 215-230, 237, 250, 251-277, 360-361. 363-372, 374-383).

Plaintiff underwent a biopsychosocial diagnostic assessment on July 1, 2005, after which the clinician diagnosed Plaintiff with bipolar disorder, personality disorder, not otherwise specified, hypertension, hypercholesterolemia, degenerative disc disease and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 390).

## **STANDARD FOR DISABILITY**

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively:

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *[Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir.1990)]. *Id.*

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding
of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

Fifth, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F. 3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).

If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## **ALJ DETERMINATIONS**

After consideration of the entire record, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Act through June 30, 2007.

2. Plaintiff had not engaged in substantial gainful activity since October 1, 2002, the alleged onset date.

3. Plaintiff had severe impairments such as degenerative disc disease of the lumbar spine, depression and anxiety; however, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

4. Plaintiff was capable of performing her past relevant work as a janitor, production worker and cleaning person. This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

5  Plaintiff was not under a disability as defined in the Act from October 1, 2002, through the date of the decision or February 27, 2007.

(Tr. 15-23).

## **STANDARD OF REVIEW**

11

This Court exercises jurisdiction over the review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). In reviewing claims under the Act, a district court does not review the matter *de novo. Id.* Instead, a district court is limited to examining the entire administrative record to determine whether the Commissioner's final decision is supported by *substantial evidence. Brown v. Commissioner of Social Security,* 2007 WL 4556678, *5 (N.D.Ohio 2007) (*citing Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984); 5 U.S.C. § 706(2)(E); 42 U.S.C. § 405(g)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* To determine whether substantial evidence exists to support the Commissioner's decision, a district court must not focus, or base its decision, on a single piece of evidence. Rather, a court must consider the totality of the evidence on record. *Id.* (*citing Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews,* 574 F.2d 359 (6th Cir. 1978)).

When dealing with conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.* at *6. To that end, the Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, for this Court to accept the ALJ's conclusions, it must only find that they are based on substantial evidence. *Id.*

## **DISCUSSION**

The claims in Plaintiff's Brief and Reply Brief can be consolidated into three arguments. First, the ALJ erred in by rejecting the opinion of her long term treating psychiatrist and adopted the opinion of the one-time consultative examiner. Second, the ALJ failed to mention, let alone discuss, why he rejected the opinion of the state agency psychologist. Third the ALJ erred in his evaluation of Plaintiff's credibility.

**1. THE ALJ FAILED TO ACCORD THE PROPER EVIDENTIARY WEIGHT TO PLAINTIFF'S LONG TERM TREATING PSYCHIATRIST OPINIONS.**

In this case, Plaintiff argues that the ALJ gave great weight to the opinion of the consultative psychologist, Dr. Pinsky and less weight to the opinions of Dr. Smith, her treating psychiatrist.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security,* 502 F.3d 532, 540 (6th Cir. 2007) (*see Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-530 (6th Cir. 1997) (*citing* 20 C.F.R. § 404.1527(d)(2) (1997)). A physician is considered a treating source if the claimant sees the physician with a frequency that is consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. *Id*. at 540 (alteration in original) (*quoting* 20 C.F.R. § 404.1502). A treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Farmer v. Astrue,* 2008 WL 343254, 6 (S. D. Ohio 2008) (*citing Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986)). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is consistent with the other substantial evidence in the record. *Id.* (*citing Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994)).

If the opinion of a treating source is not accorded controlling weight, an ALJ must apply a host of

factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialty of the treating source in determining what weight to give the opinion. *Wilson v. Commissioner of Social Security,* 378 F. 3d 541, 544 (6th Cir. 2004) (*citing* 20 C. F. R. § 404.1527(d)(2)). In summary, to apply the correct legal standards, the ALJ's decision to reject the treating physician's opinion must be based on good and specific reasons why the treating physician rule is inapplicable. *Id.*

The ALJ considered Dr. Smith a treating psychiatrist. However, the nature and extent of the relationship with Dr. Smith included Plaintiff's attempt at providing signs and/or symptoms of her impairment and Dr. Smith's adjustment of her medication to treat the symptoms. There is no evidence that medically acceptable clinical and laboratory techniques were performed. When the ALJ considered the supportability of the treating psychiatrist's opinions, he determined that such treatment and opinions were based solely on Plaintiff's subjective complaints and responses to Dr. Smith's inquiry. The ALJ was not compelled to give substantial weight to the opinions of Dr. Smith when her own clinical findings were not well supported by medically acceptable clinical and laboratory techniques.

The ALJ correctly set forth the standards applicable to evaluating a treating physician's opinions, applied the treating physician rule, applied the legal factors of specialization, supportability and consistency, and conducted meaningful review of Dr. Smith's opinions. The ALJ did not err in his decision to discount Dr. Smith's opinions because substantial evidence supports this assessment. Considering that the rejection of the opinions of the treating psychiatrists is supported by good reasons, the Magistrate defers to the ALJ's findings.

The second prong of this argument is that the ALJ also erred in relying on the opinion of the consultative examiner, Dr. Pinsky.

The regulations mandate, "Unless the treating physician's opinion is given controlling weight, the ALJ *must explain* in the decision the weight given to the opinions of a state agency medical or psychological consultant or other program physician or psychologist, as the ALJ must do for any opinions from treating sources, non-treating sources, and other non-examining sources who do not work for us." 20 C.F.R. § 404.1527(f)(2)(ii) and 20 C.F.R. § 416.927(f)(2)(ii) (Thomson Reuters/West 2008). The regulations suggest that opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. 20 C. F. R. §§ 404.1527 (d), (f) and 416.927(d), (f) (Thomson Reuters/West 2008). This occurs because the Commissioner views non-examining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, Social Security Ruling (SSR) 96-6p (July 2, 1996). Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. 20 C.F.R. §§ 404.1527 (d), (f) and 416.927(d), (f) (Thomson Reuters/West 2008).

The ALJ correctly set forth the standard for evaluating state agency medical consultants (Tr. 19). Dr. Pinsky's area of specialty was identified as psychiatry. The ALJ relied on her opinion in assessing Plaintiff's cognitive abilities. Such findings were given greater weight only insofar as they were supported by other evidence in the record and consistent with other evidence in the record (Tr. 20, 21). The Magistrate finds that reliance on the state agency medical consultant for the limited purpose of assessing cognition was

appropriate.

**2.   THE ALJ FAILED TO DISCUSS WHY HE REJECTED THE OPINION OF THE STATE AGENCY PSYCHOLOGIST.**

Plaintiff submits that the ALJ erred in failing to discuss or even mention the weight given to Dr. William B. Benninger's opinions (Tr. 184-200). The Magistrate finds that the ALJ did not reject Dr. Benninger's opinions. The ALJ's narrative discussion includes a statement that he considered the opinions of the non-examining physicians, weighed the opinions and attributed considerable weight to those opinions (Tr. 22). In fact, the ALJ's residual functional capacity analysis reflects Dr. Benninger's findings that Plaintiff was capable of understanding simple repetitive tasks involving only occasional contact with the general public, co-workers and supervisors (Tr. 18). Plaintiff's second claim lacks merit.

**3.   THE ALJ ERRED IN HIS EVALUATION OF PLAINTIFF'S SUBJECTIVE SYMPTOMS.**

Plaintiff argues that the ALJ embellished her symptoms to justify a finding that she was not credible. As examples, the ALJ found that Plaintiff could perform various household chores. Plaintiff argues that she testified that it took an inordinate amount of time to complete these household chores and that her daughter completed the bulk of these chores. The ALJ found that Plaintiff drove; however, Plaintiff testified that she did not drive because of hallucinations. The ALJ found that Plaintiff could manage her money. Plaintiff testified, however, that she did not have a bank account and she used money orders to complete her financial transactions. The ALJ found that Plaintiff shopped. Plaintiff claimed that she shopped only when her caseworker or daughter accompanied her. Finally, the ALJ found that Plaintiff talked on the telephone. Plaintiff argues that the ALJ failed to mention that such telephone conversations were conducted for the purpose of calming her down.

Clearly, however, it is the function of the ALJ, and not the reviewing court, to evaluate claimant's credibility. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 -248 (6th Cir. 2007) (*citing*

*Walters, supra*, 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 538 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)).  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7P, 1996 WL 374186, * 4 (July 2, 1996).  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  SSR 96-7p, at *4.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  SSR 96-7p, at * 4.  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must assess the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."  SSR 96-7p, at *4.

   The record shows that the ALJ adopted her testimony as well as the function report prepared by Plaintiff in determining the nature of her daily activities.  He found that she could care for her personal needs, prepare meals, perform some household chores, manage money, pay bills, shop, talk on the telephone and drive (Tr. 21).  The finding that Plaintiff could engage in all of these activities is supported by evidence in the entire record as well as Plaintiff's testimony (Tr. 127-134, 135-141, 142-148, 176-177, 178-183, 201-244, 566, 567-568, 571, 572, 580, 581, 585, 587).  The ALJ was not persuaded that the degree and nature of her ability to engage in these activities was of the severity Plaintiff claimed.  The ALJ conducted the appropriate analysis.  He articulated his reasons for crediting and rejecting Plaintiff's complaints and resolved the conflicts in the evidence.  Accordingly, the Magistrate finds that the ALJ"s credibility finding

is supported by substantial evidence.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.

So ordered.

/s/ Vernelis K. Armstrong<br>United Stats Magistrate Judge

Dated: March 10, 2009